# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7324 | **DATE** | March 19, 2004 |
| **CASE TITLE** | USA -v- NOAH ROBINSON | | 89 CR 908-31 |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order denying certificate of appealability.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | MAR 22 2004 date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | 77 |
| | Copy to judge/magistrate judge. | | |
| JS | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 2 2 2004

| United States of America | ) |
| :--- | :--- |
| Plaintiff, | ) |
| | ) No. 02 CV 7324 (89 CR 908-31) |
| v. | ) |
| | ) Judge James F. Holderman |
| Noah R. Robinson | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER
## DENYING CERTIFICATE OF APPEALABILITY

Noah Robinson ("Robinson") has sought to initiate an appeal from the dismissal of his motions filed under 28 U.S.C. § 2255. His right to appeal is governed by the requirements found at § 2253(c). Under the provisions of that section, a certificate of appealability ("COA") may issue only if the applicant has made a substantial showing of the denial of a constitutional right. The United States Supreme Court in Slack v. McDaniel, 529 U.S. 473 (2000), gave further meaning to that requirement as it pertains to constitutional claims that were addressed on the merits stating:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253 (c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong.

Id. at 484.

As to district court denials on procedural grounds, the Court further held in Slack that:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Id.

77

The Supreme Court in <u>Slack</u> also reaffirmed its long-standing position stated in <u>Ashwander v. TVA</u>, 297 U.S. 288, 347 (1936), that procedural issues, which may be dispositive, should be resolved before any constitutional question is addressed. <u>Slack</u>, 529 U.S. at 485.

In this case, Robinson filed three motions purportedly under § 2255. His first filing, which he entitled "<u>First Amended</u> Motion to Vacate, Set-Aside or Correct Conviction or Sentence Pursuant to 28 U.S.C. 2255" (Dkt. #1)[1], was mailed to this court from his place of incarceration on October 8, 2002. The "1-year period of limitation" of § 2255 did not expire until October 9, 2002, which was one year after the United States Supreme Court denied Robinson's second petition for <u>certiorari</u> on October 9, 2001 in <u>Green v. United States</u>, 534 U.S. 968 (2001). Robinson's first motion (Dkt. #1), therefore, was timely filed. Robinson's "Second Amended Motion" (Dkt. #17) was mailed November 27, 2002, a month-and-a-half after the deadline, and his "Third and Final Motion" (Dkt. #16) was mailed December 7, 2002, almost two months after his time expired. I have considered only the issues presented in Robinson's timely-filed first motion. I did not consider the untimely second or third motions, and I so advised Robinson in my September 12, 2003 ruling (Dkt. #29). No jurist of reason would find my decision not to address the motions which Robinson filed after the § 2255 limitation period had expired on the statute of limitations to be wrong or debatable. <u>Rodriguez v. United States</u>, 286 F.3d 972 (7th Cir. 2002), cert. denied, 123 U.S. 46 (2002).

In his only timely motion (Dkt. #1), Robinson raised two primary issues: (1) ineffective assistance of his appointed appellate counsel on Robinson's direct appeal (pages 7-30), and (2) inadequacy of the general verdicts returned by the jury regarding the narcotics conspiracy and RICO conspiracy counts (pages 31-40).

---

[1] Docket entry designations in the form "Dkt. # ___" are to the original docket of this case, 02 CV 7324, unless otherwise stated.

2

I.  The General Verdicts

Turning first to Robinson's claim as to the inadequacy of the general verdicts, Robinson contends that the concurrent life sentences he received on Count One (RICO conspiracy under 18 U.S.C. § 1962 (d)) and on Count Three (narcotics conspiracy under 21 U.S.C. § 846) of the second superseding indictment were not properly supported by specific jury findings. The Seventh Circuit, on April 3, 2001, on remand from the Supreme Court in light of Apprendi v. New Jersey, 530 U.S. 466 (2000), in an unpublished order which reinstated the concurrent life sentences received by Robinson, along with sentences received by his co-defendants, stated that:

> [T]he evidence shows beyond any possible doubt that the defendants, whose vast drug conspiracy is detailed in the opinion that the Court remanded, United States v. Boyd, 208 F.3d 638 (7th Cir. 2000), were responsible for such a large quantity of drugs that had the jury been correctly instructed, it would have found them guilty beyond a reasonable doubt of the offenses for which they were sentenced. We agree, therefore, with the government's suggestion that the original judgments be, and they hereby are, reinstated. United States v. Jackson, 236 F.3d 886 (7th Cir. 2001) (per curiam).

United States v. Green, 6 Fed. Appx. 377, 2001 WL 338109 (7th Cir. 2001) (unpublished order).

The record in this case fully supports the Seventh Circuit's determination on this point in its April 3, 2001 order on remand. The drug quantities, especially the drug quantity of cocaine, that Robinson reasonably foresaw being distributed, as a part of and in furtherance of the conspiracy of which Robinson was a member, were "beyond any possible doubt," id., substantially more than the 5 kilograms of cocaine and 1 kilogram of heroin necessary under 21 U.S.C. § 841(b)(1)(A)(i) and (ii) for the imposition of a life sentence.

Robinson, on page 2 of "Robinson's Exhibit B" to "Defendant Robinson's Proffer of Proof . . ." (Dkt. #60), vehemently asserts, using bold and underlining for emphasis, that:

> **The Seventh Circuit's drug quantity calculation was wrong, period,** in their April 3, 2001 order after remand from the Supreme Court only because it was based on undetected fraudulent information.

3

Reasonable jurists would find the determination made in the Seventh Circuit's April 3, 2001 order to be neither wrong nor debatable.

Robinson, in his "Exhibit B" of his "Proffer of Proof . . .," attacks the Seventh Circuit's ruling with what he calls "[F]ive (5) sample illustrations" which he contends "is a representative sampling of what the Seventh Circuit mistakenly relied upon in making its drug quantity determination." (Dkt. #60; Exhibit B, pg. 3.)

First of all, I am confident that the Seventh Circuit, in reaching the conclusion articulated in its April 3, 2001 unpublished order, relied on the whole 1996 retrial record, not merely the government's Circuit Rule 54 representations. However, to determine that the correctness of the Seventh Circuit's ruling is not debatable, I reviewed, once again, the record with special focus on what Robinson calls his "Illustrations."

The first three of what Robinson labels in bold type to be his **"Illustrations of Circuit Rule 54, False Statements"** pertain to page 5, paragraph 8 of the "Government's Circuit Rule 54 Statement."[2] The first of the initial three "Illustrations" of which Robinson complains is the

---

[2]Paragraph 8 of the Government's Circuit Rule 54 Statements states in full as follows:

> 8. The evidence regarding quantity was also overwhelming. The conspiracy spanned period of over 20 years, and defendants' participation in it ranged from about 20 years (Green, Knox and Mays) to about six years (Robinson). It included daily drug dealing over a wide area of Chicago's south side involving hundreds of distributors. The proceeds of this enterprise allowed the El Rukns to acquire entire apartment buildings, which they fortified and used to house gang members and their families, and from which they sold drugs. Tr. 1845-65, 3858-62, 5510-14. They paid mortgages and utilities on these buildings, and legal fees for gang members who got arrested, all with drug proceeds. Tr. 5593-98. In the mid-1980's, through Robinson's connections alone, the El Rukns were receiving at least two kilograms of cocaine per month. Tr. 4817-21[sic]. Beginning in 1985 and continuing until the indictment was returned in 1989, the El Rukns sold heroin through an offshoot of the gang called the gorilla family (Tr. 1925-33, 2954-57, 5536-40), and their heroin sales grossed between $5,000 and $7,000 per day. Robinson introduced gang members to heroin suppliers who supplied the gorilla family with some of the heroin that was distributed. Tr. 1993-97. The district court noted that its finding that defendants were responsible for at least 10 kilograms of heroin or 50 kilograms of cocaine was a conservative estimate. 10/22/97 Green Tr. 31-32. Based on this record,

sixth sentence and the accompanying citation contained in paragraph 8 of the Circuit Rule 54 Statement filed by the government which states:

> In the mid-1980's, through Robinson's connections alone, the El Rukns were receiving at least two kilograms of cocaine per month. Tr. 4817-21.

The citation accompanying the government's statement is clearly a typographical error, because the citation should have been to transcript pages 4017-21, the testimony of Earl Hawkins which supports the government's statement, not pages 4817-21, the testimony of Daniel Brannigan.[3]

Earl Hawkins was a general in the El Rukn organization and a co-conspirator of Robinson's who testified for the government. Hawkins testified about certain conversations with Jeff Fort, the El Rukn leader, and other El Rukns at the El Rukn Fort headquarters between 1983 and 1985. Hawkins further testified that he saw "Kilos" (Tr. 4019, line 3), kilogram quantities, of cocaine distributed at the El Rukn Fort headquarters during the period between 1983 to 1985 and that the frequency of Hawkins seeing these kilogram quantities distributed was "First; once, about two times a month, then it increased." (Tr. 4019.) Other government witnesses, such as Jackie Clay, corroborated the conspiracy's cocaine sales in the mid-1980's. By 1984, the El Rukns had a "program" devised by Jeff Fort for the selling of cocaine by the El Rukn generals and officers in which the cocaine was provided on consignment (Tr. 1882) to them without the El Rukn generals and officers having to first pay for it, and after they sold the cocaine they would return to the El Rukn headquarters with the drug money. (Tr. 1873-81.) During the conspiracy, and foreseeable to Robinson beginning in 1983, the El Rukns' building

---

any jury that found defendants guilty would also have found that the narcotics conspiracy involved in excess of one kilogram of heroin or five kilograms of cocaine.

[3]This typographical error was first made in the government's brief on direct appeal, page 7, first full paragraph, eighth line, and apparently never corrected.

5

security personnel also sold cocaine "anytime of the day or night" (Tr. 1864), "24 hours a day" (Tr. 3863), at several El Rukn-owned buildings in 1984. (Tr. 1864-82.) Among the sources of the cocaine to the El Rukns were cocaine suppliers provided by Noah Robinson. (Tr. 1883-1994; 3858-62.)

Based on the full record, the quantity of cocaine distributed by the members of the conspiracy reasonably foreseeable to Robinson was beyond any possible doubt much more than five kilograms, the amount necessary to establish the statutory maximum sentence of life in prison under 21 U.S.C. § 841(b)(1). The evidence established that Robinson's involvement with the El Rukns' cocaine sales from Robinson's cocaine supply sources began sometime in 1983, and by 1984 was well underway.[4] Robinson never withdrew from the conspiracy until it ended in 1989 when Robinson was charged with the crimes of which he was ultimately convicted and sentenced. The Seventh Circuit's April 3, 2001 determination that Robinson and his co-defendants "were responsible for such a vast quantity of drugs" that the offenses for which Robinson and his co-defendants were sentenced would have been found by the jury beyond a reasonable doubt is without doubt correct and not debatable based on the quantity of cocaine alone distributed by the conspiracy.

The above-described quantities of cocaine were, however, not the only illegal drugs proved to have been reasonably foreseeable to Robinson in support of the Seventh Circuit's April 3, 2001 determination on remand. Robinson arranged for heroin to be supplied to the

---

[4]The 1984 sales rate of two kilograms of cocaine per month, which was proven to have later increased (Tr. 4019), calculates to 24 kilograms of cocaine a year. Robinson's involvement in the conspiracy spanned approximately five years, which results in a total cocaine distribution foreseeable to him of 120 kilograms. Judge Zagel calculated for sentencing of Robinson's co-defendant Charles Green the amount of cocaine distributed in furtherance of the conspiracy to be "at the 150-kilogram range." (Dkt. #5179, 89 CR 908, October 22, 1997, 4:00 p.m., pgs 31-32.) Consequently, the amount of cocaine distributed by the conspiracy that was reasonably foreseeable to Robinson was proven to well exceed the 50 kilograms the government sought to have attributed to Robinson, which is ten times the five kilogram amount of cocaine necessary to result in a statutory maximum sentence of life for Robinson under 21 U.S.C. § 841(b)(1).

6

El Rukns' conspiracy members. Yet, Robinson complains that further misrepresentations were made in the Circuit Rule 54 statement filed by the government. The second of Robinson's purported "Illustrations" is on page 4 of his "Exhibit B" to his "Proffer of Proof" (Dkt. #60; Exhibit B, pg. 4) the eighth sentence, which states:

> Robinson introduced gang members to heroin suppliers who supplied the Gorilla family with some of the cocaine that was distributed. Tr. 1993-97.

Robinson implores, in his usual style of underlining for emphasis and bold type:

> Now read the referenced Jackie Clay testimony cited by the government: There are no references to heroin, or to the **Gorilla Family**, or to any of the Clay-referenced persons being **suppliers of heroin** to anybody. Again, does this court suppose the Seventh Circuit folk actually read Clay's testimony, before they concluded that it supports a **"beyond any possible doubt"** finding that Noah Robinson was either involved in or facilitated **"such a large quantity of drugs (heroin)"** trafficking?

(Dkt. #60; Exhibit B, pgs. 4-5.)

Robinson, not the Seventh Circuit, is wrong. Clay, throughout his testimony, interchangeably used the words "dope" and "heroin" (Tr. 1775-2689) as did other witnesses who were former El Rukns, such as Earl Hawkins (Tr. 4023, line 6) and others (Tr. 3143). Clay's references to "dope" on transcript page 1994, line 12; transcript page 1995, line 2; and transcript page 1995, line 23 were each references to heroin. Clay also testified that Robinson told Clay about Robinson's connections with heroin suppliers, including Thomas "Blue" Burnside and Codell "Cody" Griffin, who supplied both cocaine and heroin to and during the conspiracy. (Tr. 1994-97.)

Robinson's third alleged "Illustration" relates to the seventh sentence of paragraph 8 of the Circuit Rule 54 Statement which states:

> Beginning in 1985 and continuing until the indictment was returned in 1989, the El Rukns sold heroin through an offshoot of the gang called the gorilla family (Tr. 1925-33, 2954-57, 5536-40), and their heroin sales grossed between $5,000 and $7,000 per day.

7

Robinson's primary complaint about this sentence in paragraph 8 of the Circuit Rule 54 Statement is set forth in the last sentence of each of the last two paragraphs on page 5 and the first paragraph on page 6 of Robinson's Exhibit B to his Proffer and stated in bold: **"No drug quantity testimony."** (Dkt. #60; Exhibit B, pgs. 5-6.)

The conspiracy's daily heroin sales figures of $5,000 to $7,000 were proven through the testimony of former El Rukn general Edgar Cooksey (Tr. 2961) and were derived from the sale of $10 bags of heroin in two 12-hour shifts, twenty-four hours a day. (Tr. 2956-61.) The exact quantity of heroin that those daily sales represented, however, was not stated by any witness. Daily heroin sales of $5,000 in "dime," i.e., $10 bags, represents the sale of 500 $10 bags, which calculates to more than $1.5 million per year in money acquired by the conspiracy through heroin sales.[5]

Even without specific testimony regarding specific quantities of heroin being distributed over specific periods of time, the evidence established that a vast quantity of heroin was distributed by 25 to 30 El Rukn conspirators (Tr. 5540) who were a part of the "Gorilla Family" from 1985 to 1989 (Tr. 4022-24) as foreseeable by Robinson who had arranged for the supply of heroin to the conspiracy. (Tr. 1994-97.) As stated earlier, even without specific testimony as to specific quantities of heroin, the specific quantity of cocaine the conspiracy distributed as reasonably foreseen by Robinson proven by the evidence presented to the jury more than established, beyond any possible doubt, the facts necessary for the statutory maximum sentence of life in prison under 21 U.S.C. § 841(b)(1) which Robinson received.

The fourth of Robinson's "Illustrations" of purported misrepresentation in the government's Circuit Rule 54 Statement, as argued by Robinson on pages 9 and 10 of Exhibit B

---

[5] If each $10 bag contained the user quantity of 1/10 gram of heroin, the conspiracy was selling at least 50 grams a day, which calculates to 350 grams a week or 18.2 kilograms per year (350 grams per week x 52 weeks per year ÷ 1000 grams per kilogram) which over the 4 years the conspiracy sold heroin calculates to well over the 30 kilograms, that Judge Zagel found had been proven. (Dkt. #5179, 89 CR 908, October 22, 1997, 4:00 p.m., pages 31-32.)

8

to Robinson's Proffer (Dkt. #60; Exhibit B), is based on the second sentence of paragraph 7, on page 4, of that Circuit Rule 54 Statement, which states:

> There was evidence regarding the distribution of drugs other than heroin and cocaine – T's and Blues, marijuana and codeine syrup – but the evidence overwhelmingly established that in the 1980's heroin and cocaine were the dominant drugs being distributed, and that these defendants participated directly in such distribution. Tr. 1925-57, 2954-61, 4014-16, 4817-21 [sic], 5536-40.

Robinson again complains on page 9 of his Exhibit B about what was, as shown earlier in this opinion, a typographical error by the government which erroneously cited trial transcript pages 4817 through 4821 and the Daniel Brannigan testimony, when it is clear that the Earl Hawkins' testimony, at pages 4017 through 4021, is what was intended.

Earl Hawkins' testimony at pages 4014 through 4016 related to Robinson, code name "Local," who in the middle 1980's made arrangements to provide, or as Hawkins' testified, "to hook us [El Rukns] up with some connects" (Tr. 4015, line 25), drug suppliers for the El Rukn drug distribution conspiracy. The drug suppliers, whose nicknames were "Blue" and "Cody" (Tr. 4016, line 2), to which Hawkins in his testimony referred, were Thomas "Blue" Burnside and Codell "Cody" Griffin. They, among others, as Robinson arranged, supplied more than 24 kilograms of cocaine annually to be distributed as part of the El Rukn drug conspiracy beginning in about 1983. (Tr. 4018-19.) Beginning in 1985, "heroin" or "dope," as it was referred on occasion by certain witnesses during their trial testimony (Tr. 4023, line 6; 3143), was supplied by these suppliers as arranged by Robinson to a group of 25 or 30 El Rukn conspirators (Tr. 5540) called the "Gorilla family." (Tr. 4022-24.) There is no doubt cocaine and heroin were the dominant drugs distributed by the narcotics conspiracy of which Robinson was convicted and sentenced. (Dkt. # 5178, 89 CR 908, October 22, 1997, 3:00 p.m.)

Finally, I address Robinson's fifth "Illustration":

> E. <u>Government's Circuit Rule 54 Statement, Page 3, Point 4:</u>
> "All four [retrial] defendants [including Noah Robinson] were found by the district court (Judge Zagel) to be responsible for in excess of 10 Kilograms of heroin or 50 kilograms of cocaine."

9

which is on page 10 of Exhibit B of Robinson's "Proffer" (Dkt. #60; Exhibit B). Robinson complains that this, the last sentence in paragraph 4 of the Circuit Rule 54 Statement[6] regarding Judge Zagel's finding, "was a bold-faced lie." (Dkt. #60; Exhibit B, page 11.)

Judge Zagel, at the sentencing of Robinson's co-defendant Charles Green at 4:00 p.m. on October 22, 1997 (Dkt. #5179, 89 CR 908), made the rulings regarding the base offense level under the U.S. Sentencing Guidelines and made findings based upon a preponderance of the evidence as to the drug quantities involved in the conspiracy. Judge Zagel stated in open court at line 17 of page 31 and continuing through line 6 on page 32 of the transcript:

> In all honesty, based on the evidence, I would arrive, not at level 36, but at level 38. Ten kilograms of heroin in the context of the amount of time this took and the size of the operation seems to me to be a little low. 50 kilograms of cocaine also seems to me to be a little low. Cocaine, of course, turns over much more quickly because one who uses cocaine has to use it more often than one who uses heroin.
>
> My finding would be, were I left to my own devices, that you are into the 30-kilogram range of heroin, and I would think by preponderance you're at the 150-kilogram range of cocaine, and it is preponderance that I have to follow.
>
> But the government has asked for 36. I don't really feel comfortable upping the government's estimate, but I actually think by asking for 36, they're on the low end. So I sustain the drug quantity, I sustain that finding. . . .

---

[6]The full text, with citations, of paragraph 4 of the government's Circuit Rule 54 Statement is:

> 4. The statutory maximum penalties for engaging in a narcotics conspiracy are set out in 21 U.S.C. § 841(b), and they are graduated according drug type and quantity. This Court has held, in the wake of Apprendi, that drug type and quantity are elements to the extent that they effect the statutory maximum penalties. United States v. Nance, 236 F.3d. 820, 824 (7th Cir. 2000). If the defendant does not have a prior drug felony conviction – and none of these defendants did – the statutory maximum where any amount of heroin or cocaine is involved is 20 years. 21 U.S.C. § 841(b)(1)(C). It goes up to 40 years if the offense involves at least 100 grams of heroin or 500 grams of cocaine, and life if the offense involves at least one kilogram of heroin or five kilograms of cocaine. §§ 841 (b)(1)(A) and (B). All four defendants were found by the district court to be responsible for in excess of 10 kilograms of heroin or 50 kilograms of cocaine. 10/8/97 Knox Tr. 6-7; 10/22/97 Green Tr. 30-33; 10/22/97 Robinson Tr. 18-20; Mays PSR at 8-9.

10

(Dkt. #5179, 89 CR 908, October 22, 1997, 4:00 p.m., pages 31-32.)

The Seventh Circuit's standard, as stated in its April 3, 2001 ruling, for its evaluation of the evidence presented to the jury at the 1996 retrial of Robinson and his co-defendants, was not merely a preponderance of the evidence as used by Judge Zagel in sentencing Robinson and his co-defendants, and not merely proof beyond a reasonable doubt as used by the jury in convicting Robinson and his co-defendants, but proof "beyond any possible doubt." United States v. Green, 6 Fed. Appx. 377, 2001 WL 338109 (7th Cir. 2001). The evidence regarding the magnitude of the cocaine distributed by the conspiracy reasonably foreseeable to Robinson was so overwhelming that no reasonable jury which found Robinson guilty of the offenses for which he was sentenced could not have also found that Robinson was responsible for more than five kilograms of cocaine, the statutory minimum cocaine quantity under 21 U.S.C. § 841(b)(1) necessary for the statutory maximum to be a life sentence. Therefore, based upon that April 3, 2001 ruling by the Seventh Circuit, the jury's general verdicts were harmless error beyond any possible doubt.

As stated earlier, no reasonable jurist would find the April 3, 2001 ruling by the Seventh Circuit to be wrong or even debatable based upon the full record in the case. See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

II. Ineffective Assistance of Appellate Counsel

Robinson, in addition to his contention of error as to the jury's general verdicts, asserted on page 6 of his Motion (Dkt. #1) that the conduct of attorney John Beal, his appellate counsel, violated Robinson's Sixth Amendment right to the effective assistance of counsel and summarized his claims as follows:

11

- **Ineffective Assistance of Counsel**, with six (6) sub-categories, each representing separate and distinct issues, which include the following:

    a- **Judicial Recusal** issue
    b- **Drug Quantity** issue
    c- **Statutory Maximum Penalty** issue
    d- **Sentencing Guidelines Misapplication** issue
    e- **Rule 54 Statement Fiasco** issue
    f- **Standard of Error** issue

Robinson has not sustained the requirements under the Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984), standard for ineffective assistance by his appellate counsel on any of his asserted claims. See Smith v. Robbins, 52 U.S. 258, 286-89 (2000) (applying the requirements of Strickland to a claim of ineffective assistance by appellate counsel).

A. "Judicial Recusal" - Failure to Challenge Mandamus-Only Rule

Robinson contends that attorney Beal's failure to challenge the mandamus-only rule for appellate review of Judge Zagel's denial of Robinson's motion to recuse constitutes constitutionally ineffective appellate advocacy. The Sixth Amendment right to effective assistance of counsel does not and should not compel counsel to have the ability "to forecast changes or advances in the law." Valenzuela v. United States, 261 F.3d 694, 700 (7th Cir. 2001). The notion that a counsel's failure to predict that the Seventh Circuit would change this long-standing rule regarding review of recusal requests, when the Seventh Circuit to this day and in the face of dissent among its judges has not done so, to be attorney incompetence is a notion no reasonable jurist would find to be wrong or debatable.

B. "Drug Quantity" - Failure to Challenge the Drug Quantity Determinations by Judge Zagel

The Seventh Circuit's April 3, 2001 ruling cited and quoted earlier in this opinion answers this argument by Robinson. No reasonable jurist would find the ruling to be wrong or debatable based upon the whole retrial record.

12

C. "Statutory Maximum Penalty" - Failure to Challenge the Statutory Maximum Penalties of Life in Prison

As stated earlier, a maximum statutory life sentence under 21 U.S.C. § 841 (b)(1) was clearly supported by the evidence for the narcotics conspiracy, Count Three of the second superseding indictment. A statutory maximum life sentence for the racketeering conspiracy under 18 U.S.C. § 1962(d) is authorized when the maximum statutory penalty for an underlying racketeering activity is life imprisonment under, 18 U.S.C. § 1963(a).[7] Since the narcotics conspiracy, for which the statutory maximum was life, was an underlying racketeering act charged in the RICO conspiracy, Count One of the second superseding indictment, the RICO conspiracy's statutory maximum was life. It certainly could not be considered to fall below the minimum level of competence required by the Sixth Amendment for a lawyer not to argue contrary to the clear statutory authority of 18 U.S.C. § 1963(a). No reasonable jurist would find this determination to be wrong or debatable.

D. "Sentencing Guidelines Misapplication" - Failure to Challenge the Use of the 1989 Manual as Opposed to the 1987 Manual

This attack by Robinson relates to the underlying racketeering act of the murder of a Mr. Barber. Robinson can establish no prejudice under this claim because the statutory maximum sentence of life in prison for Count One, the racketeering conspiracy, is supported independent of this issue, as discussed in the previous section, by 18 U.S.C. § 1963(a) because of the statutory maximum of life in prison for the underlying drug conspiracy racketeering act.

Therefore, no matter which sentencing guideline manual was used, the 1989 or the 1987, the statutory maximum sentence of life was appropriate for Count One, the racketeering

---

[7]Title 18 U.S.C. § 1963(a) states in pertinent part that:

(a) Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both, . . . .

13

conspiracy, of which Robinson was convicted. No reasonable jurist would find this determination to be wrong or debatable.

### E. "Rule 54 Statement Fiasco" - Failure to Challenge the Government's Circuit Rule 54 Statement on Remand from the Supreme Court

Because it is clear that the Seventh Circuit did not forsake the record and rely solely on the government's Circuit Rule 54 statement, after the remand from the Supreme Court, to make its April 3, 2001 ruling, which is discussed and quoted earlier in this opinion, Robinson can establish no prejudice stemming from any action or any absence of action by Beal, his appellate counsel, on this issue. No reasonable jurist would find that this determination is wrong or debatable.

### F. "Standard of Error" - Failure to Challenge the Standard of Review Employed by the Seventh Circuit on Remand from the Supreme Court

"[B]eyond any possible doubt" was the standard employed by the Seventh Circuit in its April 3, 2001 ruling discussed and quoted earlier. No more lenient standard was applied. Nothing Robinson's appellate counsel Beal could have done would have changed that outcome. Robinson can show no prejudice resulting from his counsel's conduct on this issue. No reasonable jurist would consider this determination to be wrong or debatable.

## CONCLUSION

Having reviewed the record and the rulings pertaining thereto, no reasonable jurist would find that the determinations made to be constitutionally wrong or debatable. Therefore, the certificate of appealability is denied.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
United States District Judge

DATE: March 19, 2004

14